**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 16-274 |
| | ) | Judge Nora Barry Fischer |
| SANTANA WYGANT, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.    INTRODUCTION

Presently before the Court is a Petition filed by the Probation Office on January 13, 2017; a Supplemental Petition filed by the Probation Office on January 18, 2017; a Notice Regarding Supervised Release Violation Hearing filed by the Government on March 2, 2017; a Second Notice Regarding Supervised Release Violation Hearing filed by the Government on June 14, 2017; and a Third Notice Regarding Supervised Release Violation Hearing filed by the Government on August 4, 2017.  (Docket Nos. 4, 7, 22, 32, 40).   On June 2, 2017, the Court held a supervised release hearing, at which time Defendant admitted to the Grade C violations set forth in the Petition and Supplemental Petition.  (Docket No. 27).  On August 9, 2017, the Court held a hearing regarding the revocation of Defendant's supervised release, at which time the Government and Defendant presented evidence with respect to the disputed Grade A and Grade B violations in the Government's notices.  (Docket No. 41).  Defendant presented additional evidence at a continuation of the hearing on October 10, 2017.  (Docket No. 53).  After careful consideration of the record, and for the following reasons, the Court finds that the Government has demonstrated by a preponderance of the evidence that Defendant committed Grade A and Grade B violations.  The Court will proceed as scheduled on October 18, 2017.  (*See id.*).

II.     FINDINGS OF FACT

*A. Procedural History*

On September 15, 2009, Defendant was sentenced by the United States District Court for the Northern District of West Virginia to 108 months' imprisonment for aiding and abetting the distribution of cocaine base within 1,000 feet of a protected location, followed by a six-year term of supervised release with standard and additional conditions. (Docket No. 1-2). Defendant's sentence was reduced from 108 months' imprisonment to 87 months' imprisonment on January 12, 2012. (Docket No. 1-3). Jurisdiction of this matter was transferred to this Court on October 12, 2016. (Docket No. 1-4 at 10). On December 13, 2016, the Court granted the Probation Officer's request that the conditions of Defendant's term of supervision be modified to permit him to reside at the Renewal Center for a period of not more than six months, to commence as soon as possible. (Docket No. 3).

By way of a Petition filed on January 13, 2017, and a Supplemental Petition filed on January 18, 2017, the Probation Office advised the Court that Defendant had violated several conditions of his supervised release. (Docket Nos. 4, 7). On March 2, 2017, the Government filed a Notice Regarding Supervised Release Violation Hearing, wherein the Government averred that Defendant had committed Grade A, Grade B, and Grade C violations and attached supporting exhibits. (Docket No. 22). In light of the same, the Court granted Defendant's two requests to postpone the supervised release hearing. (Docket Nos. 24, 26).

On June 2, 2017, based upon the parties' agreement, the Court held a supervised release hearing, at which time Defendant admitted to the Grade C violations set forth in the Petition and Supplemental Petition. (Docket No. 27). The Court scheduled a hearing as to Defendant's Grade A and Grade B violations for August 9, 2017. (*Id.*). In the interim, Defendant filed an ex

parte motion to fire his counsel, and his counsel filed a motion to withdraw. (Docket Nos. 28, 29). On June 14, 2017, the Court held a hearing to address the motions, which were terminated as moot after the hearing. (Docket No. 31). Also on June 14, 2017, the Government filed a Second Notice Regarding the Supervised Release Hearing. (Docket No. 32). On June 22, 2017, and on June 26, 2017, the Court granted Defendant's requests for service of two subpoenas duces tecum. (Docket Nos. 36, 38). On July 21, 2017, the Government filed a brief in support of its Notice Regarding Supervised Release Violation Hearing. (Docket No. 39). On August 4, 2017, the Government filed a Notice Regarding Supervised Release Violation Hearing, wherein it detailed the crimes alleged to have been committed by Defendant. (Docket No. 40).

The Court held a hearing regarding the revocation of Defendant's supervised release on August 9, 2017, at which time the Government and Defendant presented evidence regarding the Grade A and Grade B violations. (Docket No. 41). After the parties completed their presentations, the Court granted Defendant's request that the remainder of the hearing be continued to permit him to access additional records. (*Id.*). The Court scheduled the continuance of the hearing for September 7, 2017. (Docket No. 42).

On August 22, 2017, Defendant filed a Motion to Enter Cell Tower Information into Evidence, which the Court denied because the motion was made pro se while Defendant is represented by counsel. (Docket Nos. 44, 45). The same day, the official transcript of the proceeding held on August 9, 2017, was filed. (Docket No. 46). On September 5, 2017, the Court granted Defendant's Unopposed Motion to Postpone the Supervised Release Violation Hearing, wherein Defendant stated that he had not yet received the records that he requested. (Docket Nos. 47, 48). The Court rescheduled the hearing for October 10, 2017. (Docket No. 48). After receiving a letter and attachment from Defendant's counsel, the Court convened a

teleconference on September 29, 2017.  (Docket No. 49).  Defendant's counsel agreed to file the letter and attachments as a pleading and stated that he will present a witness with respect to the attachments at the hearing on October 10, 2017.[1]  (*Id.*).  On October 3, 2017, the Government filed a Post-Hearing Memorandum Regarding Supervised Release Violation, and Defendant filed Proposed Findings of Fact and Conclusions of Law.  (Docket Nos. 51, 52).  On October 10, 2017, Defendant presented additional evidence at a continuation of the hearing.  (Docket No. 53).

        *B.*  Government's Allegations

In its Third Notice Regarding Supervised Release Violation Hearing, the Government delineated the crimes alleged to have been committed by Defendant.  (Docket No. 40).  Specifically, the Government stated that the Pennsylvania State crimes alleged to have been committed include:

(1)  Terroristic Threats, 18 Pa.C.S. § 2706, Misdemeanor 1 (M1), Grade B;

(2)  Rape, 18 Pa.C.S. §§ 3121(a)(1) and (2), Felony 1 (F1), Grade A;

(3)  Involuntary Deviate Sexual Intercourse, 18 Pa.C.S. §§ 3123(a)(1) and (2), Felony 1 (F1), Grade A;

(4)  Theft By Unlawful Taking, 18 Pa.C.S. § 3921(a) (*see* 18 Pa.C.S. § 3903(b) and 18 Pa.C.S. § 1103), Grade B or C;

(5)  Simple Assault (intentional), 18 Pa.C.S. § 2701(a)(1), Misdemeanor 2 (M2), Grade A (adult victim);

(6)  Simple Assault (intentional), 18 Pa.C.S. §§ 2701(a)(1) and (b)(2), Misdemeanor 1 (M1), Grade A (child victim); and

---

[1] Rather than filing the letter and attachments as a pleading on the Docket, Defendant's counsel presented the same as Exhibits E, F, G, and H at the hearing held on October 10, 2017.  (*See* Docket Nos. 53-2, 53-3, 53-4, 53-5).

(7) Criminal Trespass, 18 Pa.C.S. § 3503(a)(1)(i), Felony 3 (F3), Grade B

(*Id.*).

### C. Hearing Held on August 9, 2017

#### a. Defendant's Competency

At the hearing on August 9, 2017, the Court found Defendant to be competent. (Docket No. 46 at 8). Specifically, based upon Defendant's appearance, his demeanor, his answers to the Court's questions, and the interactions between him and his counsel, as well as his attorney's representations, the Court concluded that Defendant was competent and that he could participate in the hearing. (*Id.*).

#### b. Evidence Presented at the Hearing

At the outset, it is well established that it is the Government's burden to prove that a violation of supervised release was committed by a preponderance of the evidence. *See* 18 U.S.C. § 3583(e)(3). The evaluation of the credibility of the evidence is left to the discretion of the Court. *See United States v. Conde*, 58 F. App'x 538, 539-40 (3d Cir. 2002) (citing *United States v. Whalen*, 82 F.3d 528, 531 (1st Cir. 1996) ("[T]he District Court was in the best position to determine witness credibility.")). Hence, the Court's factual findings that follow summarize the facts that were established during the hearing by a preponderance of the evidence.

The testimony of three witnesses was presented during the hearing: (1) L.D., one of the victims of Defendant's alleged violations; (2) Valerie Mozes; and (3) Defendant. (*See* Docket No. 46 at 20-135). The testimony of each witness centered around events occurring on the evening of December 5, 2016.

The Government presented the testimony of one witness, L.D. (*Id.* at 20-70). While testifying, L.D. reviewed her communications with Defendant through text messages, which

were admitted as Government's Exhibits 1A through 1DD.  (*Id.* at 21; *see also* Docket Nos. 41-1 through 41-32).  In explaining why Defendant is listed as "Sperm Donor" in her telephone, L.D. stated, "[T]hat's all he is," and noted that she and Defendant have a child, R., together.  (Docket No. 46 at 21-22; *see also* Docket Nos. 41-1 through 41-32).  In summarizing the text messages between her and Defendant on November 25, 2016, L.D. testified that when Defendant texted, "Get ur. [sic] Ass up [sic] show me titties[,]" he wanted her to take pictures of herself.  (Docket No. 46 at 23; Docket No. 41-4).  Defendant next texted, "Let me c [sic] them big ass titties," and, "Wtf," which L.D. testified means, "[W]hat the fuck," when she did not respond.  (Docket No. 46 at 23-24; Docket No. 41-5).  Defendant continued to send text messages throughout the day and requested "picd," but L.D. did not respond until Defendant asked, "What u [sic] doin [sic]," to which L.D. wrote, "Usual, u [sic]?," and Defendant responded, "Work."[2]  (*Id.* at 24-25; Docket Nos. 41-6, 41-7).  L.D. stated that she had not responded to Defendant's earlier messages because she did not want to send him pictures or encourage him.  (Docket No. 46 at 25).  On November 26, 2016, Defendant texted, "Mornin [sic]," to which L.D. did not respond.  (Docket No. 46 at 25; Docket Nos. 41-8, 41-9).  Defendant did not send L.D. another text message until the morning of December 7, 2016, when he wrote, "U [sic] up," "Get up," and "What u [sic] doinbto [sic] my baby."  (Docket No. 46 at 25-26; Docket Nos. 41-8, 41-9).

After acknowledging the large gap of time between November 26 and December 7, 2016, L.D. reviewed the events of her day on December 5, 2016.  (Docket No. 46 at 26).  L.D. stated that she was at school until 2:00 p.m., picked R. up from daycare, and returned to her home for the rest of the day by 3:00 p.m.  (*Id.*).[3]  Defendant arrived at L.D.'s home around 5:00 p.m. after

---

[2] L.D. testified that "picd" means Defendant was requesting photograph of L.D. and R.  (Docket No. 46 at 24).

[3] L.D. and R. live in Brookline, which is located in the South Hills of Pittsburgh.  (*Id.* at 26-27).  On December 5, 2016, L.D. did not know where Defendant was living, but she later learned that he was living with Ms. Mozes in

he picked up dinner from McDonald's for R. (*Id.* at 28-29).[4] Defendant fed R. her dinner in the dining room while L.D. remained in the living room for approximately one-half hour. (*Id.*). Defendant then entered the living room and "kept trying to give [L.D.] hugs," while she "would just keep moving away from him" because "[h]e was just crossing the line." (*Id.*). L.D. retreated upstairs to her bedroom and shut the door. (*Id.*). Defendant then went upstairs with R. and said that he was going to try to put her to bed.[5] (*Id.* at 29). When R. did not want to go to bed "because it was too early," Defendant "was getting frustrated" and "threw her down on the bed." (*Id.*). In explaining how Defendant threw R. on the bed, L.D. testified, "He tossed her. He was holding her in his arms and she was being fussy, so he tossed her down on the bed and she landed on her back." (*Id.* at 30). R.'s crying increased when she was thrown on the bed. (*Id.*).

L.D. testified that she was upset with Defendant's action and asked him to give R. to her. (*Id.*). Defendant then "got really aggressive," "pushed [L.D.] down on the bed," and "proceeded to attack [her]." (*Id.*). To this end, L.D. stated that "[Defendant] just pushed me by my shoulders down onto the mattress and forcefully made me have sex with him." (*Id.* at 30-31). She explained that Defendant removed her clothes, pushed her shorts to the side, and had sexual intercourse with her by inserting his penis into L.D.'s vagina. (*Id.* at 31). L.D. did not want to have sexual intercourse with Defendant, and she asked him to stop. (*Id.*). L.D. testified, "I kept telling him, why are you doing this. I kept asking him why because we are not that close, we don't have sex. The last time we had sex was two days before R.'s birthday and he forced me to have sex then." (*Id.*). During the course of the assault, R., who was thirteen months old at the time, was still on the bed next to L.D. (*Id.* at 32). Defendant had an orgasm, and L.D. told him

---

Clairton, which is located in the South Hills of Pittsburgh. (*Id.* at 27-28).

[4] Defendant had called L.D. earlier in the day and told her that he would visit that day with dinner for R. (*Id.* at 29).

[5] On cross examination, L.D. stated that she and R. sleep in the same bed. (*Id.* at 56).

to leave because her father would be arriving within fifteen minutes.  (*Id.*).  Defendant gathered his things and left.  (*Id.*).

In returning to the text message communications, L.D. explained that there was a large gap of time between November 26 and December 7, 2016, because there was little communication between the two and because she had deleted some of the text messages.  (*Id.* at 32-33).  L.D. stated that on December 7, 2016, Defendant texted, "What [u] doinbto [sic] my baby," because he was outside of her home and heard R. screaming upstairs in her bedroom.  (*Id.* at 33; Docket Nos. 41-9, 41-10).[6]  Defendant then texted, "Y [sic] i [sic] hav [sic] to keep callin [sic]," "I kno [sic] shit is fucked up but damn," "im [sic] so sad people r [sic] the way they r [sic]," "I need a few seconds of ur [sic] time can [sic] u [sic] come down stairs [sic] and talk to me," and, "Hello."[7]  (Docket No. 46 at 33-34; Docket Nos. 41-10, 41-11, 41-12).  L.D. testified that Defendant came inside her home that morning and was downstairs in her living room when he heard her father say something inappropriate, which is why he left L.D.'s home and sent her the text messages.[8]  (*Id.* at 34).  L.D. did not respond to Defendant's messages because she had school that morning.  (*Id.*; Docket Nos. 41-10, 41-11, 41-12).

L.D. did not communicate with Defendant until December 9, 2016, when she texted, "U [sic] hurt us so bad we never [sic] gon [sic] b [sic] ok."  (Docket No. 46 at 35; Docket No. 41-12).  L.D. was referencing "[w]hat he had done to us, how he had attacked me in front of R., and just everything he has done as a whole."  (Docket No. 46 at 35).  When Defendant responded, "Stop texting me," L.D. replied, "I c [sic] but u [sic] can blow up my phone then show up at my

---

[6] L.D. did not expect Defendant to be at her house that day.  (Docket No. 46 at 33).

[7] Defendant's, "Hello," was sent nearly six hours after the previous messages.  (Docket No. 46 at 34; Docket No. 41-12).

[8] On cross examination, L.D. stated that her father had used "[t]he N word."  (Docket No. 46 at 58).  She explained that Defendant had opened her door, stepped one foot in, heard what her father said, put his shoes back on, and walked out the door.  (*Id.* at 60).

house rite [sic]?," and, "And let urself [sic] in my front door." (Docket No. 46 at 35; Docket Nos. 41-13, 41-14). L.D. testified that she was referring to when he came to her house and entered without her permission. (Docket No. 46 at 35). Four hours after she texted, "Quit pretending like u [sic] care wen [sic] actually u [sic] careless," L.D. texted, "Did u [sic] go to jail?" (*Id.* at 36; Docket No. 41-16). In discussing this text message, L.D. testified, "[A]fter he assaulted me Monday, I told him that I was going to call the police and report it and get the PFA [Protection from Abuse] reinstated because I didn't want him around me or R. anymore. He told me, don't worry about it, because he is going back to jail that Friday for probation violations. So he was going to be going back to jail." (Docket No. 46 at 36). When Defendant did not respond, L.D. assumed that he had gone back to jail. (*Id.* at 37).

L.D. learned that Defendant had not returned to jail when she was shopping at Target with her mother and R. and saw Defendant, who did not acknowledge L.D. or R. (*Id.*). On December 19, 2016, L.D. texted, "U [sic] can walk up in my house tresspassn [sic] but u [sic] cant [sic] even say hello to [R.] or even acknowledge her in public, u [sic] can take my pussy against my will while my baby is watchn [sic] but u [sic] cant [sic] say hi to her as u [sic] pass us at the store? Is that rite [sic] daddy? Ur [sic] a sick mutherfucker [sic] don't [sic] ever come around us again ur [sic] fuckn [sic] crazy." (Docket Nos. 41-17, 41-17). L.D. stated that she sent the text message because Defendant had sexually assaulted her and because she was frustrated with him for the reasons included in the message. (Docket No. 46 at 38). On December 20, 2016, when L.D. texted, "I will never understand y [sic] u [sic] decided to hurt me and [R.] so bad but i [sic] hope it was worth it," she was referring to Defendant throwing R. on the bed and sexually assaulting L.D. (*Id.* at 39; Docket No. 41-18).

On December 25, 2016, L.D. texted, "Lying to us for months, played us, u [sic] not in jail

u [sic] fuckn [sic] 2 face [sic] liar." (Docket No. 46 at 39; Docket No. 41-19). L.D. also texted, "Its [sic] ok u [sic] let fugs harass me n [sic] [R.] weneva [sic] shes [sic] feeln [sic] weak and lonely." (Docket No. 41-19). L.D. explained that "fugs," which means "fucking ugly," is in reference to Ms. Mozes. (Docket No. 46 at 39-40). She also stated that Defendant had given her telephone number to Ms. Mozes and that Ms. Mozes "would continuously call me and text me out of the blue for no reason at all." (*Id.* at 40). Also on December 25, 2016, L.D. texted, "U [sic] raped me in front of [R.] two weeks ago . . . dnt [sic] lie, im [sic] sick of u [sic] sayn [sic] im [sic] crazy cuz [sic] u [sic] so ignorant u [sic] kno [sic] the truth Santana, u [sic] did this to me and [R.]," and, "U [sic] didnt [sic] have to hurt us so bad, u [sic] just did it cuz [sic] u [sic] hate us i [sic] guess idk."[9] (*Id.*; Docket No. 41-20). While discussing Defendant's responses, "I aint [sic] saw [sic] u [sic] n [sic] week quit ur [sic] shit," and, "Dont [sic] take it out on [R.] cause [sic] u [sic] mad at me," L.D. noted that Defendant did not deny that he had raped her or assaulted R. (Docket No. 46 at 41; Docket No. 41-21).

On December 26, 2016, L.D. sent several screen shots of text messages that Ms. Mozes had sent to her. (Docket No. 46 at 41-42; Docket Nos. 41-22 through 41-29). In discussing why she forwarded the messages to Defendant, L.D. stated, "[W]henever I would bring that to his attention, he would act like she never did anything, I'm making this up. He didn't believe me." (Docket No. 46 at 42.). That day, L.D. also texted, "My dad was here that mornin [sic] u [sic] broke in my house so i [sic] hav [sic] a witness," and, "U [sic] get away with so much in life . . . responsibilities etc [sic] . . . u [sic] think u [sic] can shit on me & [R.] then get away with that too, ima [sic] make sure u [sic] pay this time cuz [sic] u [sic] didnt [sic] hav [sic] to hurt us so bad u [sic] did it deliberately, shit u [sic] never even apologized u [sic] keep on hurtn [sic] us."

---

[9] "idk" means, "I don't know." (Docket No. 46 at 41).

(Docket No. 46 at 42-43; Docket Nos. 41-29, 41-30).  L.D. testified that her text messages referred to the day that Defendant entered her home without permission and to the day that Defendant raped her and assaulted R.  (Docket No. 46 at 43).

At 3:45 a.m. on December 27, 2016, L.D. texted, "Is that u [sic] at my door??," "Go away," and, "Omg idk who it is."[10]  (*Id.* at 43-44; Docket No. 41-31).  In discussing these messages, L.D. stated, "I thought it was him at first because I didn't think anybody else would be at my door in the middle of the night.  Then whenever he didn't respond, I didn't know who it was."  (Docket No. 46 at 44).  Defendant responded approximately seven hours later by texting, "No not at ur [sic] crib but u [sic] kno [sic] this."  (Docket No. 46 at 44-45; Docket No. 41-32).  L.D. never learned who was at her door but believes that it was Defendant.  (Docket No. 46 at 44).  At the conclusion of her direct examination, L.D. reiterated that Defendant entered her home without permission, that he raped her; and that he threw R. on the bed.  (*Id.* at 45).  She also noted that Defendant has threatened her by calling her and stating that she abuses [R.] and that he "could get her taken off of me."  (*Id.*).

On cross examination, L.D. again stated that some of the text history was not preserved.  (*Id.* at 46).  She noted, however, that she did not recollect deleting any text messages or photographs that could have been text messages between the end of November and December 7, 2016.  (*Id.* at 47).  She stated that she and Defendant had communicated through telephone calls from November 25, 2016, through the end of December.  (*Id.* at 47-48).  L.D. also testified that the texting history ended on December 27, 2016, because she purchased a new phone.  (*Id.* at 48).

L.D. next reviewed text messages from January 16, 2017, wherein Defendant texted, "What do I do from here," and, "I want to turn myself in."  (*Id.* at 48-49; Docket No. 41-35).

---

[10] "Omg" means, "Oh my God."  (Docket No. 46 at 44).

L.D. did not recall Defendant's messages, but she remembered her response, "U [sic] turn urself [sic] in yet?" (Docket No. 46 at 48-49; Docket No. 41-35). L.D. then addressed her PFA, which was filed in January 2017. (Docket No. 46 at 49-50).[11] L.D. testified that Defendant was personally served at the Renewal Center on January 13, 2017, and that he left the Renewal Center approximately one hour after he was served with the PFA. (Docket No. 46 at 50-51). To this end, L.D. explained that Defendant's Probation Officer called her approximately one hour after Defendant was served and advised her to go home, lock her doors, and avoid answering the door because Defendant had left the Renewal Center. (*Id.* at 51). L.D. returned to her text messages from January 16, 2017, wherein she stated, "U [sic] kno [sic] my intentions were to keep [R.] safe away from u [sic] & fugs. I never intended for u [sic] to go back to prison for 4yrs, [sic] wow, u [sic] did that to urself [sic]," "Felt bad for yest [sic] wen [sic] p told me u [sic] had a temper tantrum & got urself [sic] 4yrs [sic] in prison," and "[R.] says bye hav [sic] a nice life w [sic] fugs."[12] (*Id.* at 51-52; Docket No. 41-35). In discussing why she contacted Defendant on January 16, 2017, after having previously sought a court order requiring that there be no contact, L.D. testified, "I wanted to know if he was in jail or if I should still be scared every time I go out my front door." (Docket No. 46 at 52).

On redirect, L.D. testified that a hearing with respect to her PFA was not held "because [Defendant] was on the run, so they were unable to get him to come to court to have the PFA hearing. So they just granted me the PFA and we never had a hearing." (*Id.* at 61). She confirmed that the sworn statement contained in her PFA provided that Defendant had sexually assaulted her; that he had assaulted R.; and that he broken into her home. (*Id.*). In discussing the

_____

[11] Although the 2017 PFA was not admitted as an exhibit, the Government attached it as an exhibit to its Notice Regarding Supervised Release Violation Hearing. (*See* Docket No. 22-2).

[12] "Yest" is an abbreviation for "yesterday," and "P" is Patrick, Defendant's friend. (*Id.* at 52).

PFA that she filed in 2015, L.D. explained that she stated that Defendant had stolen from her because "[w]hen I used to work, he used to take my money when I had it."[13] (Docket No. 46 at 62). L.D. also stated that Defendant threatened her because "[h]e would just threaten me that he was going to hurt me or my dog or my family." (*Id.* at 63). L.D. noted that she participated in therapy or counseling as a result of the sexual assault and that she was prescribed medication that she only took for two weeks because her body did not adjust well to it. (*Id.* at 68).

Defendant first presented the testimony of Ms. Mozes. (*Id.* at 75-97). Ms. Mozes testified that she is Defendant's fiancée, that she has four children ranging between the ages of three and sixteen, and that she has two children with Defendant. (*Id.* at 75, 77). She stated that in the days leading up to December 5, 2016, Defendant was residing at her home. (*Id.* at 76). With respect to December 5, 2016, Ms. Mozes testified that she had not been home because she had a doctor's appointment and that Defendant "was out and busy, he was doing business." (*Id.* at 79). She stated that Defendant arrived home "roughly" between 7:00 p.m. and 7:30 p.m. that evening. (*Id.* at 78). Ms. Mozes testified that she specifically recalled watching the television program, "Love & Hip Hop," on December 5, 2016. (*Id.* at 79). She explained that she, Defendant, and the children routinely watch the program, which is "like a reality show" involving "famous people based on their lives, love, drama." (*Id.*). The program begins at 8:00 p.m. and ends at 9:00 p.m. (*Id.* at 79-80). When asked which individuals watched the program on December 5, 2016, Ms. Mozes testified, "Me, [Defendant], my oldest daughter, and probably the middle daughter as well." (*Id.* at 79). With respect to L.D., Ms. Mozes testified that the two "went back and forth a few times about [Defendant]" through text messages. (*Id.* at 82).

On cross examination, Ms. Mozes stated that the episode of "Love & Hip Hop" on

---

[13] Although the 2015 PFA was not admitted as an exhibit, the Government attached it as an exhibit to its Notice Regarding Supervised Release Violation Hearing. (*See* Docket No. 22-1).

December 5, 2016, "was about Yandy breaking up and somebody finding out they was cheating on one another." (*Id.* at 84). She could not recall the specifics of the episodes that aired on December 12 and December 19, 2016, because "it's very similar and it's just different things happen." (*Id.*). Ms. Mozes further stated that she recalled watching the program on December 5, 2016, because she took her daughter to the doctor's office that day. (*Id.*). She testified that she had verified the appointment date through her text messages. (*Id.* at 85). She stated that she "probably" visited Primary Care in Oakland and did not know which doctor had seen her daughter. (*Id.* at 85-86). Ms. Mozes admitted that Defendant returned home shortly before "Love & Hip Hop" aired; that she did not know exactly when that was; and that she did not know what Defendant was doing before he returned home. (*Id.* at 88-89). With respect to L.D., Ms. Mozes confirmed that the two do not have a good relationship and that she had called L.D. "ugly." (*Id.* at 86). In discussing her personal background, Ms. Mozes testified that she was charged with theft in 2008 or 2009. (*Id.* at 88). She also stated that she uses marijuana. (*Id.*).

On redirect, Ms. Mozes was shown a printout summarizing the episodes of "Love & Hip Hop." (*Id.* at 89-90; Docket No. 41-34). Ms. Mozes testified that the description of the episode that aired on December 5, 2016, corresponded with what she recollected about seeing the program that day. (Docket No. 46 at 90). She recalled that Defendant was beside her as she watched, "as always." (*Id.*).

Defendant next presented his own testimony. (*Id.* at 97-135). He testified that he began working for Dish to install satellite dishes in November 2016. (*Id.* at 98-99). He also stated that he stayed at Ms. Mozes's home every night. (*Id.* at 99). When questioned whether he was at Ms. Mozes's home between 5:00 p.m. and 8:00 p.m. on December 5, 2016, Defendant stated, "Well, I don't remember exactly where I was at." (*Id.* at 100). He further testified, "The only

reason I remember that I was at [Ms. Mozes's] house to watch 'Love & Hip Hop' is because I watch it every single week, I never miss a week, I even watched it in prison." (*Id.*). After testifying that it takes "[o]ver half an hour" to drive from L.D.'s home to Ms. Mozes's home, Defendant stated, "I can't say how many minutes I arrived home before 'Love & Hip Hop' because I didn't pay attention to when I come [sic] home. I just come home because I know my show was coming on so I know I am going to be there at 8 o'clock." (*Id.* at 101).

With respect to entering L.D.'s home, Defendant answered, "Yes," when he was asked, "December 7th, do you admit that you did enter her place that day?"[14] (*Id.* at 102). In addressing L.D.'s deletion of text messages, Defendant relayed events that allegedly occurred on December 8, 2016. (*Id.* at 104-07). Specifically, Defendant testified that L.D. threw R. across the room that day, that he picked R. up and laid her on the couch, and that he tried to run out the door because he "didn't want [L.D.] to do something to [R.]." (*Id.* at 104-05). Defendant stated that when he ran across the street, L.D. "threw [R.] on top of the hood of the car." (*Id.* at 105). Defendant testified that because he had Ms. Mozes's car, which had a car seat in the back seat, he took R. and drove to his friend's home. (*Id.* at 106). He stated that he did not call the police because he "didn't want [R.] to go through CYF." (*Id.*). Defendant noted that L.D. began texting him that she "would never hurt [R.]" and that he was "shocked when those text messages wasn't [sic] in there on her phone." (*Id.* at 106-07). After R. fell asleep, he returned R. to L.D. (*Id.* at 107).

In turning back to December 5, 2016, Defendant stated that he did not go to L.D.'s home at all, that he did not throw R. on a bed, that he did not sexually assault L.D., and that he did not

---

[14] On cross examination, Defendant testified, "[W]hen I walk in her house, I take my shoes off and I am about to put my keys on her little stand right there and I hear her dad upstairs [using the N word]. . . . So instead of me confronting him, I walk back outside and I text her." (*Id.* at 127). Defendant then stated that he did not know whether his entrance was "without permission" because "[L.D.] normally just leaves the door open for me and I just walk in." (*Id.* at 128).

rush out of the house because L.D.'s father was arriving.  (*Id.* at 109).  When asked, "Between 5 and 8 that day and after 8 that day, where were you?," Defendant answered, "Well, after 8 I know for a fact that – well, a little [before] 8 and after 8 I know I was at home."  (*Id.* at 110).  Defendant next discussed the text messages from January 16, 2017, which he explained were sent to his Probation Officer.  (*Id.* at 110-11; Docket No. 41-35).  Specifically, Defendant sent the messages, "What do I do from here," and, "I want to turn myself in," to his Probation Officer.  (Docket No. 46 at 110-11; Docket No. 41-35).  He then forwarded three messages from L.D. to his Probation Officer.  (Docket No. 46 at 111-13; Docket No. 41-35).

On cross examination, Defendant admitted that he did not tell his Probation Officer that he was living with Ms. Mozes.[15]  (*Id.*).  However, Defendant did not admit that he lied to his Probation Officer and testified, "I lived at my brother's house too, but I was trying to establish a relationship with [Ms. Mozes] so I was at her house more often than I was at my actual residence," and, "[W]hat I said was most of the time during that time that I was at her house."[16] (*Id.* at 116).  Defendant then answered, "No," when he was asked whether he occasionally would stay with his brother.[17]  (*Id.* at 118).  When asked why Defendant sent text messages to L.D. asking her to show him her "titties," Defendant stated that "she would just send me pictures of her titties, so I figured if I said that to her, it would get her to answer me back when I was trying to get her to respond back to me, which it didn't work."[18]  (*Id.* at 119-20).

---

[15]  Defendant responded, "No, I didn't," when he was asked, "But you will admit that you never told your [P]robation [O]fficer that you lived with [Ms. Mozes]."  (Docket No. 46 at 116).

[16]  During his direct examination, Defendant testified, "I stayed at [Ms. Mozes's] house every single night.  I never missed a night.  I never even stayed out late."  (*Id.* at 99).

[17]  Defendant later stated, "Yes, I lied about my residence."  (*Id.* at 129).  During this line of questioning, Defendant also responded, "Correct," when he was asked whether he was untruthful when he did not tell his Probation Officer that he had left his old job for a job at Dish.  (*Id.*).

[18]  Defendant later testified, "[W]hen I have her blocked on my phone, the only way she can get through is if she

When questioned whether he worked for Dish on December 5, 2016, Defendant stated, "Not that I recall," and, "Not that I remember." (*Id.* at 120-21). In addressing the events on December 8, 2016, at which time L.D. allegedly threw R. across the room, Defendant testified that "[L.D.] always does little crazy things and she gets like really hyper and she does things." (*Id.* at 122). Defendant could not explain why L.D. threw R. across the room, and he stated, "I don't even know what to do," after L.D. threw R. on the hood of the car. (*Id.* at 122-23). When asked why Defendant gave R. back to L.D., Defendant stated, "I think I am going to the halfway house the next day," and, "CYF is just as bad as leaving it with her." (*Id.* at 123-24).

After the Government and Defendant completed their presentations, Defendant requested that the record remain open to enable him to obtain telephone records. (*Id.* at 135). The Government had no objection, and the Court granted Defendant's request. (*Id.* at 136). The parties agreed to continue the remainder of the hearing. (*Id.* at 136-37). The Court ordered the preparation of the transcript, the costs to be split by the parties, and ended the hearing. (*Id.* at 139-40).

### D. Hearing Held on October 10, 2017

#### a. Defendant's Competency

At the hearing on October 10, 2017, the Court found Defendant to be competent. (*See* Docket No. 53). Specifically, based upon Defendant's appearance, his demeanor, his answers to the Court's questions, and the interactions between him and his counsel, as well as his attorney's representations, the Court concluded that Defendant was competent and that he could participate in the hearing. (*See id.*).

---

sends me a picture. So if she sends me a picture and a text message underneath, that's why she does that." (*Id.* at 126).

### b. Evidence Presented at the Hearing

The Court first explained that it had previously reviewed Defendant's Exhibits E, F, G, and H, as they had been earlier provided to the Court by Defendant's counsel. The exhibits were admitted after the Government had no objection. (*See* Docket Nos. 53-2, 53-3, 53-4, 53-5). Defendant's Exhibit I, a Certificate of Achievement, and Exhibit J, a letter written by Danielle Strimlan, were also admitted. (*See* Docket Nos. 53-2, 53-6, 53-7).

Defendant then presented Mark Ganley as a witness.[19] Mr. Ganley is employed by the Office of the Federal Public Defender as a computer systems administrator. He maintains the network, trains users, replaces equipment, and provides litigation support. Mr. Ganley has been trained as a forensic examiner, and he has been certified as a cell phone examiner. In providing litigation support, Mr. Ganley analyzes data related to cell phone towers and global positioning system ("GPS") information, creates PowerPoints for openings and closings, and uses Trial Director to display evidence at trial. Through his work for clients of the Office of the Federal Public Defender, Mr. Ganley interfaces with the Federal Bureau of Investigation, the state police, Immigration and Customs, the Department of Homeland Security, and the Secret Service.

In discussing Defendant's case, Mr. Ganley stated that he and investigator Kevin Parent requested Defendant's call detail records from Metro PCS, T-Mobile. Because the records from December 5, 2016, were provided in "Greenwich Mean Time," which is five hours ahead of Eastern Standard Time, Mr. Ganley and Mr. Parent made a second document request. As a result, the records included in the first request ended at 7:00 p.m., Eastern Standard Time, on December 5, 2016. The records included in the second request covered 7:00 p.m., Eastern Standard Time, and twelve hours forward, on December 5 and 6, 2016.

---

[19] An official transcript has yet to be prepared. Given same and the parties' request to expedite these matters, the Court makes its findings without the transcript.

Mr. Ganley first reviewed Exhibit E, which is a list of entries that were returned from T-Mobile for the date of December 6, 2016. (*See* Docket No. 53-2). He explained that the entries begin at twenty minutes after midnight, Greenwich Mean Time, on December 6, 2016, which is 7:20 p.m., Eastern Standard Time, on December 5, 2016. The entries end at 11:49 p.m., Greenwich Mean Time, on December 6, 2016, which is 6:50 p.m., Eastern Standard Time, on December 6, 2016. Mr. Ganley next discussed Exhibit F, which is a map that he created by using Google Maps. (*See* Docket Nos. 53-2, 53-3). Mr. Ganley stated that he plugged in the longitude and latitude coordinates of the cell towers that are included in Exhibit E and located the Elizabeth cell tower, the Jefferson Hills cell tower, and the West Mifflin cell tower. He circled 5006 Bataan Avenue and Belaire Avenue as the addresses where L.D. lives and where Defendant was staying. (*See* Docket No. 53-5). Mr. Ganley then reviewed Exhibit G, which is an Excel spreadsheet that he created. (*See* Docket Nos. 53-2, 53-4). He stated that he converted the Greenwich Mean Time to Eastern Standard Time, ranging from 3:19 p.m., Eastern Standard Time, on December 5, 2016, through 10:41 a.m., Eastern Standard Time, on December 6, 2016. His spreadsheet covers the records included in the first and second document requests from Metro PCS, T-Mobile.

In returning to Exhibit E, Mr. Ganley stated that the duration column is in seconds and denotes the length of each call or text message. The call type column includes mtc and moc codes, which are generally phone calls, and another SMS code, which is a text message. The direction column provides whether the phone call was incoming or outgoing. The calling number column designates the number of the person who initiated the call, while the dialed number column provides the digits dialed by the person holding Defendant's phone. The called number column is the number that was dialed for outgoing calls and Defendant's phone number

for incoming calls. Mr. Ganley used the information in the first tower latitude and first tower longitude columns to identify the tower. In discussing the first tower Azimuth column, Mr. Ganley stated that "Azimuth" is the center of the side of the tower to which the cell phone connected and that cell towers typically have three sides. He explained that because the first entries in Exhibit E list the Azimuth as 200 degrees, the side of the tower to which the phone connected was mostly south but also west, as 180 degrees is directly south and 0 degrees is directly north. With respect to the first tower latitude and first tower longitude columns, Mr. Ganley testified that the decimal numbers that are included transmit into minutes and seconds. By inserting the decimal numbers into Google Maps, a pin is dropped at each tower's location.[20] The remaining columns — first tower city, first tower state, and first tower zip — provide the city, state, and zip code for each entry.

Mr. Ganley addressed the combined meaning of Exhibits E, F, and G. He testified that he received the call history for calls for the Elizabeth cell tower, the Jefferson Hills cell tower, and the West Mifflin cell tower. Because the records for the Elizabeth cell tower and the West Mifflin cell tower included an Azimuth reading, Mr. Ganley and Mr. Parent were able to determine which direction the signal was coming from that connected to the tower.[21] Mr. Ganley explained that he inserted three arrows on Exhibit F at the Elizabeth cell tower and three arrows at the West Mifflin cell tower. Each center arrow reflects the Azimuth, while the outside arrows show the direction the signal would have come from the phone when it connected to the tower. Mr. Ganley explained that for the entries included in Exhibit G, there is a tower address with the

---

[20] Mr. Ganley used the pin drops to create Exhibit F.

[21] The Jefferson Hills cell tower did not include an Azimuth reading.

tower latitude and longitude coordinates, along with a column denoting the Azimuth readings.[22] He reiterated that Exhibit G is his compilation of the records included in the first and second document requests from Metro PCS, T-Mobile.  Using Exhibit F as a point of reference, Mr. Ganley testified that for the Elizabeth calls that occurred at 5:45 p.m. and 5:46 p.m., Eastern Standard Time, the cell phone had to have approached the tower from the south to the southwest, and possibly a bit north.  He noted that the outside dotted arrow on Exhibit F shows the range from which the signal entered.[23]  In reviewing the West Mifflin calls included in Exhibit G, which ranged from 6:36 p.m. until 7:28 p.m., Eastern Standard Time, Mr. Ganley explained that the cell phone had to be somewhere south of Century III Mall because the Azimuth reading was 200.  Specifically, he noted that the outside arrow on Exhibit F cuts through Baldwin toward South Park and maintained that because cell signals travel in a straight line, the phone had to be south of Century III Mall or the West Mifflin cell tower.  In discussing the creation of Exhibits E, F, and G, Mr. Ganley testified that he used Google Maps and Google Earth, which enabled him to zoom in and see the towers within a few feet of the longitude and latitude readings.

To close his testimony on direct examination, Mr. Ganley stated that cell towers do not register hits unless a phone is making an outgoing communication or is receiving an incoming communication.  As a result, he was only able to obtain information on call detail records when the phone either sent or received a message or call.[24]  Mr. Ganley also discussed a handoff, which occurs when an individual is traveling by vehicle and reaches the limit as to how far the

---

[22] The Azimuth reading for the Elizabeth cell tower was 240, and the Azimuth reading for the West Mifflin cell tower was 200.  The Jefferson Hills cell tower did not include an Azimuth reading.  Thus, there is no designation from which angle the calls approached the Jefferson Hills cell tower.

[23] Mr. Ganley also noted that where the arrow ends on Exhibit F does not mean that the phone could not have been further away because it could have approached the tower from either the south or the west, or possibly a bit north of west.

[24] Mr. Ganley explained that if he and Mr. Parent had been able to obtain GPS information from the phone, then they would have had the exact locations at regular intervals because GPS regularly connects to satellites.

cell tower can accommodate the signal, at which point the individual is handed over to a different tower. As a result, as the individual travels from one part of a city to another, only the original tower to which the phone connected is tracked. Mr. Ganley confirmed that he assisted Defendant's counsel in preparing Exhibit H, which is a letter from Defendant's counsel that is dated September 27, 2017. (*See* Docket Nos. 53-2, 53-5). In addressing Defendant's counsel's representation that Defendant's phone did not come any closer to Brookline than the region which is south of the West Mifflin, Mr. Ganley stated that the same is based upon cell phone and call detail records showing that at the closest point to Brookline, Defendant was connecting from south of the tower, not from north of the tower.

On cross examination, Mr. Ganley confirmed that a cell phone does not register a hit unless it is making an incoming or outgoing communication. Thus, if a phone is turned off, or is turned on but does not receive any incoming or outgoing communication, then there would be no notation on the call detail records from Metro PCS, T-Mobile. Mr. Ganley agreed that the call detail records would include significant blanks if the phone was not being utilized, regardless of whether it was turned on or off. He also confirmed that a phone does not always have to hit the cell phone tower to which it is closest. Mr. Ganley elaborated that if one cell phone tower was busier than another, then the phone could possibly skip to another tower that is available for a signal. In addressing the lack of Azimuth readings from the Jefferson Hills cell tower, Mr. Ganley conceded that he could not definitively find that calls coming from Jefferson Hills did not come from Belaire Avenue itself because the signal could have skipped one tower and there is no way to verify from which direction the signal came to the Jefferson Hills cell tower. As to Exhibit F, Mr. Ganley agreed that if Defendant had been driving from the Jefferson Hills cell tower to Belaire Avenue, it would not show that Defendant took that path. Rather, it would show

that the closest tower was likely the Jefferson Hills cell tower.

In addressing the cell towers, Mr. Ganley confirmed that they are tilted a bit and stated that his understanding of the Azimuth readings was that not all cell towers face directly to the north. He testified that when he analyzed the call detail records, he assumed that they were measured in geographic degrees and not the degrees of the cell tower. Mr. Ganley's understanding was that the readings provided the orientation of the cell tower and that the Azimuth data provided the center of the wall. He agreed that cell towers generally have three sides that are 120 degree each, but the same is not always the case. Mr. Ganley testified that there are other cell towers north, west, or east of Belaire Avenue that provide signals.

On redirect, Mr. Ganley stated that each phone company has its own method of deciding which tower picks it up and noted that many variables, such as weather conditions or blockages by high mountains or tall buildings, can affect which signal is the strongest. He reiterated that throughout the course of a call, a cell phone could connect to other towers and then later connect to a closer tower. As an example, he explained that if a large number of people are using a cell tower at the same time, a cell phone may connect to another cell tower that had space. Mr. Ganley admitted that he and Mr. Parent did not make a subpoena request for all cell towers in the Greater Pittsburgh area.

In addressing his education and background with the Court, Mr. Ganley testified that he earned a degree in secondary education at Indiana University and taught social studies for four years. He then took classes through a one-year program at Computer Tech and worked for a company named PC Networks Services. Mr. Ganley has been employed by the Office of the Federal Public Defender since 1998. He stated that he has hundreds of hours in computer forensic training, he has been trained in Access Data, he is a certified computer forensic

examiner in Forensic Tool Kit, and he is certified for mobile phone examinations. Mr. Ganley noted that he has been deemed an expert witness in prior cases but stated that he considers himself to be a lay witness in the instant matter.

The Court now makes findings as to Defendant's other exhibits that were admitted on October 10, 2017, Exhibits I and J, consisting of a certificate of achievement and a letter from Ms. Strimlan. (*See* Docket Nos. 53-2, 53-6, 63-7). The certificate of achievement, which is dated July 7, 2017, certifies that Defendant successfully completed the required course of study in the forty-hour Substance Abuse Program. (Docket No. 53-6). In her letter, which is not dated, Ms. Strimlan states that Defendant is the father of her youngest son. (Docket No. 53-7). She believes that Defendant was trying to be a productive member of society when he was released from incarceration in October 2014. (*Id.*). She notes that Defendant had a difficult upbringing and "was raised in a world where you had to survive and had no stability." (*Id.*). Ms. Strimlan believes that Defendant wants to make better choices for his children and states that she and Defendant are able to co-parent together. (*Id.*). Although she and Defendant have argued over the years, Ms. Strimlan maintains that he has never been violent toward her, her son, or any woman. (*Id.*). After counsel for the Government and Defendant confirmed that they had no additional evidence to present, the Court advised that it would issue an opinion and scheduled a continuation of the hearing for October 18, 2017.

III.    LEGAL STANDARD

"'[T]here is no requirement of conviction or even indictment' to find that a defendant has violated supervised release by committing a crime." *United States v. Carter*, 730 F.3d 187, 192 (3d Cir. 2013) (quoting *United States v. Poellnitz*, 372 F.3d 562, 566 (3d Cir. 2004)). Instead, the Court may revoke a defendant's supervised release if it finds by a preponderance of the

evidence that a condition of release has been violated.  *See* 18 U.S.C. § 3583(e)(3).

IV.    DISCUSSION

In light of the relevant standard, the Court turns to its evaluation of the evidence presented by the Government as to each of the seven alleged crimes and finds that all seven were proven by the Government by a preponderance of the evidence.

A.    *Terroristic Threats*

To prove the crime of terroristic threats, the Government must demonstrate that:  "(1) 'a threat to commit a crime of violence was made'; and (2) 'the threat was communicated with the intent to terrorize or with reckless disregard of the risk of causing such terror.'"  *Fiore v. City of Bethlehem*, No. 09-CR-4247, 2011 U.S. Dist. LEXIS 34284, at *18 (E.D. Pa. Mar. 30, 2011) (quoting *Commonwealth v. Hudgens*, 582 A.2d 1352, 1357 (Pa. Super. Ct. 1990)); *see also* 18 Pa.C.S. § 2706(a)(1) ("A person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to:  (1) commit any crime of violence with intent to terrorize another."); Pa. Model Jury Instructions § 15.2706.  "[T]he defendant need not have 'specifically articulate[d] the crime of violence which he . . . intend[ed] to commit where the type of crime [could] be inferred from the nature of the statement and the context and circumstances surrounding the utterance of the statement.'"  *Fiore*, 2011 U.S. Dist. LEXIS 34284, at *18 (quoting *Hudgens*, 582 A.2d at 1358) (internal omissions and alterations in original).

In this Court's estimation, the evidence shows by a preponderance of the evidence that Defendant committed the crime of terroristic threats.  To this end, L.D. testified that Defendant threatened her because "[h]e would just threaten me that he was going to hurt me or my dog or my family."  (Docket No. 46 at 63).  The Court finds L.D. to be a credible witness.  *See Conde*,

58 F. App'x at 539-40 (citing *Whalen*, 82 F.3d at 531 ("[T]he District Court was in the best position to determine witness credibility.")). The parties' respective examinations of L.D. provided no reason for the Court to find that she testified untruthfully. While Defendant did not specifically articulate the crime of violence that he intended to commit against L.D.'s family or her dog, the same is not necessary. *Fiore*, 2011 U.S. Dist. LEXIS 34284, at *18. Further, L.D. stated in her 2015 PFA that Defendant was threatening to hurt her and her unborn baby, at which time Defendant was on supervision. (*See* Docket Nos. 4, 22-1 at 6). Accordingly, the Court finds that Government has demonstrated by a preponderance of the evidence that Defendant committed the crime of terroristic threats, which constitutes a Grade B violation.

### B. Rape

To prove the crime of rape, the Government must establish that "'the actor accomplishe[d] the crime by forcible compulsion or by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution.'" *Wingert v. Pitkins*, 2014 U.S. Dist. LEXIS 172609, at *39 n.2 (M.D. Pa. Dec. 11, 2014) (quoting *Commonwealth v. Irvin*, 393 A.2d 1042, 1044 (Pa. Super. Ct. 1978)); *see also* 18 Pa.C.S. § 3121(a)(1)-(2) ("A person commits a felony of the first degree when the person engages in sexual intercourse with a complainant: (1) By forcible compulsion. (2) By threat of forcible compulsion that would prevent resistance by a person of reasonable resolution."); Pa. Model Jury Instructions § 15.3121A. In addition to its "ordinary meaning," "[s]exual intercourse . . . includes intercourse per os or per anus." 18 Pa.C.S. § 3101. "Forcible compulsion" is defined as "[c]ompulsion by use of physical, intellectual, moral, emotional or psychological force, either express or implied." *Id.*; *see also* Pa. Model Jury Instructions § 15.3121A (stating that the force used or threatened can be physical force or violence but that an individual may also commit rape by using threatening intellectual,

moral, emotional, or psychological force).  "'The force necessary to support [a] conviction[] for rape . . . need only be such as to establish lack of consent and to induce a woman to submit without additional resistance.'"  *Wingert*, 2014 U.S. Dist. LEXIS 172609, at *39 n.2 (quoting *Irvin*, 393 A.2d at 1044) (internal omissions and alterations in original).

The Government has proven by a preponderance of the evidence that Defendant committed the crime of rape.  As discussed above, the Court finds L.D. to be a credible witness. The Court is persuaded by L.D.'s testimony that on December 5, 2016, Defendant arrived at L.D.'s home around 5:00 p.m., fed R. dinner for approximately one-half hour, and then entered the living room and tried to hug L.D.  When L.D. went upstairs to her bedroom, Defendant followed with R. and attempted to put her to bed in L.D.'s bed, where R. sleeps.  When R. did not want to go to bed, Defendant tossed her on the bed, at which point R.'s crying increased. Defendant then pushed L.D. by her shoulders onto the mattress and forcibly engaged in sexual intercourse with her by inserting his penis into her vagina.  Despite L.D.'s pleas asking Defendant to stop, he refused.

Ms. Mozes's testimony was of little to no value in determining Defendant's whereabouts on December 5, 2016.  Indeed, Ms. Mozes initially testified that Defendant arrived home "roughly" between 7:00 p.m. and 7:30 p.m. that evening.  However, on cross examination, Ms. Mozes admitted that Defendant had returned home shortly before 8:00 p.m., when "Love & Hip Hop" began."  She also conceded that she did not know exactly when Defendant returned and that she did not know what Defendant was doing before he returned home.  Further, even if Defendant had arrived home between 7:00 p.m. and 7:30 p.m., Defendant had sufficient time to commit the crime of rape because he arrived at L.D.'s home at approximately 5:00 p.m.[25]

---

[25] The Court does not find credible Defendant's testimony that it takes "[o]ver half an hour" to drive from L.D.'s home to Ms. Mozes's home.

The Court finds Defendant to be an incredible witness. As delineated in detail above, Defendant's testimony, unlike L.D.'s testimony, was inconsistent and often contradictory. In discussing December 5, 2016, Defendant stated that he did not remember exactly where he was that day but that he knew he was home "a little" before 8:00 p.m. Thus, given Defendant's and Ms. Mozes's testimony, the Court finds that Defendant did not return to Ms. Mozes's home until shortly before 8:00 p.m., which, as discussed above, would have provided Defendant with well over two hours to spend at L.D.'s home. The Court further finds that Defendant was not credible because he admitted that he was untruthful on several occasions. Indeed, Defendant admitted that he had lied to his Probation Officer about his residence and about his leaving his former job for his job with Dish.

While the Court finds that Mr. Ganley to be a credible witness, he was not an eyewitness to the events that occurred on December 5, 2016, and his testimony does not counter the credibility of L.D.[26] Further, while the exhibits that Mr. Ganley presented were thoroughly prepared, there was no evidence that Defendant had his phone with him on December 5, 2016. Indeed, when Defendant was asked where his phone was located on August 9, 2017, he stated, "I don't have it. I don't have my phone." (Docket No. 46 at 114). Other than making the cursory statement that "[y]ou never go anywhere without your phone," (*id.*), Defendant presented *no* testimony regarding where his phone was located on December 5, 2016. Having considered this, along with Mr. Ganley's testimony concerning the numerous variables associated with cell phone records, the Court concludes that the cell tower data is not dispositive of the events that took place on December 5, 2016.

---

[26] The Court acknowledges that Mr. Ganley has previously served as an expert witness. *See, e.g.*, *United States v. Eberle*, No. 05-CR-26, 2006 U.S. Dist. LEXIS 39647 (W.D. Pa. June 15, 2006). In the instant matter, however, Mr. Ganley testified that he considers himself to be a lay witness because he served as an investigator who compiled phone records. The Court agrees and deems Mr. Ganley a lay witness for purposes of these proceedings.

Finally, the Court notes that on June 2, 2017, Defendant admitted that he violated the condition that he shall reside at the Renewal Center for a period of not more than six months and shall abide by all rules, regulations, and procedures of the facility when he absconded from the Renewal Center on January 13, 2017, after he was served with L.D.'s PFA. (*See* Docket No. 27). The Third Circuit's Model Jury Instructions provide that when there is evidence of a defendant's flight, "[t]his conduct may indicate that [he] thought [he] was guilty of the crime charged and was trying to avoid punishment." 3d Cir. Model Jury Instructions § 3.14. The jury is left to decide "[w]hether or not this evidence causes you to find that the defendant was conscious of [his] guilt." *Id.* Here, when Defendant was served with L.D.'s PFA, which included L.D.'s statement that Defendant had forced her to have sexual intercourse with him, (*see* Docket No. 22-2 at 6), Defendant fled from the Renewal Center. Although the Court issued an arrest warrant on January 17, 2017, (*see* Docket No. 6), Defendant was not arrested until February 24, 2017, and he had his initial appearance that day, (*see* Docket No. 12). The Court finds that Defendant's flight tends to prove that he was conscious of his guilt. Accordingly, given the testimony presented at the hearing, coupled with the Court's credibility determinations, the Court finds that Government has demonstrated by a preponderance of the evidence that Defendant committed the crime of rape, which constitutes a Grade A violation.

### C. Involuntary Deviate Sexual Intercourse

To prove the crime of involuntary deviate sexual assault, the Government must establish that Defendant "'engage[d] in deviate sexual intercourse with a complainant, by forcible compulsion that would prevent resistance by a person of reasonable resolution.'" *Ford v. Piazza*, No. 07-CV-4855, 2008 U.S. Dist. LEXIS 113280, at *10 (E.D. Pa. June 30, 2008) (quoting *Commonwealth v. Ford,* 928 A.2d 1121 (Pa. Super. Ct. 2007)); *see also* 18 Pa.C.S. § 3123(a)(1)-

(2) ("A person commits a felony of the first degree when the person engages in deviate sexual intercourse with a complainant: (1) by forcible compulsion; (2) by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution."); Pa. Model Jury Instructions § 15.3123D. "Deviate sexual intercourse" includes "[s]exual intercourse per os or per anus between human beings." 18 Pa.C.S. § 3101.

For the same reasons discussed above, the Court finds that Defendant committed the crime of involuntary deviate sexual intercourse against L.D. Specifically, Defendant engaged in deviate sexual intercourse with L.D. when he pushed L.D. by her shoulders onto the mattress and forcibly engaged in sexual intercourse with her by inserting his penis into her vagina. Accordingly, the Court finds that Government has demonstrated by a preponderance of the evidence that Defendant committed the crime of involuntary deviate sexual intercourse, which constitutes a Grade A violation.

### D. Theft by Unlawful Taking

To prove the crime of theft by unlawful taking, the Government must demonstrate that Defendant "unlawfully [took], or exercise[d] unlawful control over, movable property of another with the intent to deprive [her] thereof." *Reedy v. Evanson*, No. 06-CV-1080, 2009 U.S. Dist. LEXIS 33319, at *25 (W.D. Pa. Apr. 20, 2009); *see also* 18 Pa.C.S. § 3921(a) ("A person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof."); Pa. Model Jury Instructions § 15.3921A. "Deprive" means "[t]o withhold property of another permanently or for so extended a period as to appropriate a major portion of its economic value, or with intent to restore only upon payment of reward or other compensation." 18 Pa.C.S. § 3901. "Movable property" is defined as "[p]roperty the location of which can be changed, including things growing on, affixed to, or

found in land, and documents although the rights represented thereby have no physical location." *Id.* "Property of another" includes "property in which any person other than the actor has an interest which the actor is not privileged to infringe." *Id.*

In this Court's estimation, the evidence shows by a preponderance of the evidence that Defendant committed the crime of theft by unlawful taking. To this end, L.D. testified that Defendant took her money when she was employed. As the Court has concluded, L.D. was credible, and the parties' respective examinations of L.D. provided no reason for the Court to find that she testified untruthfully. Further, L.D. stated in her 2015 PFA that Defendant was taking her money, at which time Defendant was on supervision. (*See* Docket Nos. 4, 22-1 at 6). Accordingly, the Court finds that Government has demonstrated by a preponderance of the evidence that Defendant committed the crime of theft by unlawful taking, which constitutes a Grade C violation.[27]

### E. Simple Assault, Adult Victim

To prove the crime of the simple assault of an adult victim, the Government must show that Defendant "attempt[ed] to cause or intentionally, knowingly or recklessly cause[d] bodily injury to another." *Thompson v. Wagner*, 631 F. Supp. 2d 664, 676 (W.D. Pa. 2008); *see also* 18 Pa.C.S. § 2701(a)(1) ("[A] person is guilty of assault if he: (1) attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another."); Pa. Model Jury Instructions § 15.2701A. "Bodily injury" is defined as "[i]mpairment of physical condition or substantial pain." 18 Pa.C.S. § 2301.

For the same reasons discussed above, the Court finds that Defendant committed the

---

[27] In its Notice, the Government stated that Defendant's offense was a Grade B or Grade C violation. The Court finds that the Government proved by a preponderance of the evidence that Defendant stole money from L.D. but did not prove a specific amount. A theft of less than $50.00 constitutes a third-degree misdemeanor, punishable by no more than one year in prison. *See* 18 Pa.C.S. § 3903(b)(2). Such offense is thus a Grade C violation under Guideline § 7B1.1.

crime of simple assault against L.D.  Specifically, Defendant attempted to cause bodily injury to

L.D. when he pushed her by her shoulders onto the mattress and when he forcibly engaged in

sexual intercourse with her by inserting his penis into her vagina.  Accordingly, the Court finds

that Government has demonstrated by a preponderance of the evidence that Defendant

committed the crime of simple assault of an adult victim, which constitutes a Grade A violation.

### F.  Simple Assault, Child Victim

To prove the crime of the simple assault of a child victim, the Government must show

that Defendant "attempt[ed] to cause or intentionally, knowingly or recklessly cause[d] bodily

injury to another." *Thompson v. Wagner*, 631 F. Supp. 2d 664, 676 (W.D. Pa. 2008); *see also* 18

Pa.C.S. § 2701(a)(1) ("[A] person is guilty of assault if he:  (1) attempts to cause or intentionally,

knowingly or recklessly causes bodily injury to another."); Pa. Model Jury Instructions §

15.2701A.  The Government must also establish that the simple assault was "against a child

under 12 years of age by a person 18 years of age or older."  18 Pa.C.S. § 2701(b)(2).  "Bodily

injury" is defined as "[i]mpairment of physical condition or substantial pain."  18 Pa.C.S. § 2301.

As discussed above, the Court finds that on December 5, 2016, Defendant arrived at

L.D.'s home around 5:00 p.m. and fed R. dinner.  When L.D. went upstairs to her bedroom,

Defendant followed with R. and attempted to put her to bed in L.D.'s bed, where R. sleeps.

When R. did not want to go to bed, Defendant tossed her on the bed, at which point R.'s crying

increased.  Thus, Defendant attempted to cause bodily injury to R. when he tossed her on the

bed.  R. was thirteen months old at the time, and Defendant was thirty-nine years old at the time.

Accordingly, the Court finds that Government has demonstrated by a preponderance of the

evidence that Defendant committed the crime of simple assault of a child victim, which

constitutes a Grade A violation.

### G. Criminal Trespass

To prove the crime of criminal trespass, the Government must establish that Defendant "[broke] into any building or occupied structure, or gain[ed] entry by subterfuge" and "[knew he was] not licensed or privileged to do so." *Newsome v. Whitaker*, No. 03-CV-3182, 2005 U.S. Dist. LEXIS 3446, at *9 (E.D. Pa. Mar. 4, 2005); *see also* 18 Pa.C.S. § 3503(a)(1)(i)-(ii) ("A person commits an offense if, knowing that he is not licensed or privileged to do so, he: (i) enters, gains entry by subterfuge or surreptitiously remains in any building or occupied structure or separately secured or occupied portion thereof; or (ii) breaks into any building or occupied structure or separately secured or occupied portion thereof."); Pa. Model Jury Instructions § 15.3503B. "Breaks into" means "[t]o gain entry by force, breaking, intimidation, unauthorized opening of locks, or through an opening not designed for human access." 18 Pa.C.S. § 3503(a). An "occupied structure" is defined as "[a]ny structure, vehicle or place adapted for overnight accommodation of persons, or for carrying on business therein, whether or not a person is actually present." 18 Pa.C.S. § 3501.

The Government not only demonstrated that Defendant committed the crime of criminal trespass, but Defendant also admitted the same. L.D.'s testimony, along with the text messages that were admitted as exhibits, show that Defendant entered L.D.'s home on December 7, 2016, heard L.D.'s father use the "N word," and left L.D.'s home. Defendant admitted that he committed the crime of criminal trespass when he responded affirmatively after he was asked if he entered L.D.'s home on December 7, 2016. While Defendant, thereafter, attempted to explain away his admission by stating that he did not know whether his entrance was without permission because L.D. often left the door opened for him, the preponderance of the evidence establishes that Defendant did not have permission to enter L.D.'s home on December 7, 2016. The Court

further notes that even if L.D.'s door had been unlocked, it is well settled that "a criminal trespass involving the entry of a building or separately secured portion thereof by opening an unlocked door [is] punishable as a felony of the third degree." *Commonwealth v. Cook*, 547 A.2d 406, 411 (Pa. Super. Ct. 1988); *see also Commonwealth v. Curl*, No. 3110 EDA 2014, 2015 Pa. Super. Unpub. LEXIS 4510, at *8 (Pa. Super. Ct. Dec. 10, 2015) (noting that it had vacated the appellant's judgment of sentence for criminal trespass graded as a felony of the second degree because he made entered the stockroom through an unlocked door, making his crime a felony of the third degree). Accordingly, the Court finds that Government has demonstrated by a preponderance of the evidence that Defendant committed the crime of criminal trespass, which constitutes a Grade B violation.

V.    CONCLUSION

Based on the foregoing, the Court finds that Defendant has committed Grade A and Grade B violations of his supervised release and will proceed to revoke same pursuant to 18 U.S.C. § 3583(e)(3) at the continuation of the violation hearing on Wednesday, October 18, 2017, at 3:30 p.m. At that time, the Court will hear any objections to its findings, will hear argument and any recommendations from the parties and the Probation Office as to an appropriate sentence in this case, will permit Defendant to allocute, and will impose his sentence for his supervised release violations.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:   October 13, 2017

cc/ecf:  All counsel of record
       U.S. Probation Office
       Santana Wygant c/o counsel Thomas Livingston, Esquire